Pennsylvania Public Utility Commission *v.* Souderton Borough et al., Appellant.

24

Argued April 13, 1967. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*James E. Frick,* with him *H. Merle Mulloy,* for appellant.

*Dominic J. Ferraro,* Assistant Counsel, with him *Joseph C. Bruno,* Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

*John R. Rezzola,* Chief Counsel, for Department of Highways, appellee.

*Peter Platten,* with him *John R. McCarron, Alonzo R. Horsey,* and *Ballard, Spahr, Andrews & Ingersoll,* and *Souder and Rosenberger,* for intervening appellees.

OPINION BY ERVIN, P. J., June 16, 1967:

This is an appeal by the Reading Company from the order of the Pennsylvania Public Utility Commission, dated October 24, 1966, directing the establishment of a temporary grade crossing of appellant's tracks at Broad Street in the Borough of Souderton (borough), Montgomery County, Pennsylvania, and apportioning

the costs thereof, and ordering the borough to make a comprehensive engineering study to determine (a) the most economical means of alleviating traffic congestion in the borough, including construction of additional crossings, if necessary and (b) to consider the feasibility of eliminating 13 highway-rail crossings in and adjoining the borough, by relocating six miles of appellant's right of way so as to by-pass the borough entirely, and apportioning the costs of this study.

On April 13, 1926, at C.6546, the Public Service Commission abolished as dangerous a grade crossing of appellant's tracks at Broad Street in Souderton and approved the construction of an underpass for vehicular traffic at Chestnut Street, some 500 feet west of the abolished crossing. The 1926 order also provided for a pedestrian underpass to be constructed at the site of the closed Broad Street crossing. On July 9, 1964 the borough filed a complaint (C.17998) against Reading Co., the Department of Highways and Montgomery County, seeking relief from traffic congestion at the Chestnut Street underpass, and suggesting re-establishment of the grade crossing at Broad Street, abolished by the Public Service Commission in 1926. After hearings, the commission dismissed this complaint April 26, 1965 for lack of jurisdiction, on the basis the question should be raised by application rather than complaint. An appeal to this Court was quashed. Later, on May 13, 1965, Souderton filed an application (A.92329) seeking reopening of the Broad Street crossing. Subsequently, October 18, 1965, the commission filed a complaint on its own motion against Souderton, the Department of Highways, Reading Co. and Montgomery County to inquire fully into the public safety at the Chestnut Street and the Broad Street crossings simultaneously. The proceedings at C.6546, C.17998 and A.92329 were incorporated by reference into the record at C.18140. Following hearings, the commission is-

sued the order of October 24, 1966, which is now here on appeal. Appellant's petition for "rehearing," filed November 9, 1966, was denied by the commission January 30, 1967. Reading Co. appealed and sought a supersedeas. Souderton and Montgomery County were allowed to intervene as appellees. Souderton filed a motion to quash the appeal, on the ground that appellant's petition for rehearing was invalid and did not extend the time for taking an appeal.

Appellant argues that the order of October 24, 1966, directing the establishment of a temporary grade crossing at Broad Street, is arbitrary, unreasonable, not supported by evidence and constitutes a flagrant abuse of discretion. A review of the evidence supports the commission's finding that the Chestnut Street crossing is inadequate to handle the present day traffic, and that the Broad Street grade crossing is necessary as a temporary remedy. The record shows conditions have changed since 1926 when Broad Street crossing was closed. The population of Souderton grew from 3,125 in 1920 to 5,381 in 1960, and was estimated to exceed 8,000 by 1985. A map shows that Front Street and Main Street run parallel, along and immediately adjacent to each side of appellant's tracks in the borough, and form a right angle intersection with both Broad Street and Chestnut Street. Front Street stops at Chestnut forming a T-intersection at the north side of the Chestnut Street underpass. There were five crossings of appellant's tracks in the borough, excluding Broad Street and including the Chestnut Street underpass, two of these at grade. From evidence introduced by the borough and the Department of Highways, the commission found that vehicular traffic had doubled and re-doubled in the forty years since the 1926 closing of the Broad Street crossing, and that the Chestnut Street underpass was operating at its maximum capacity of almost 10,000 vehicles daily. The commission

further found that the Chestnut Street crossing was inadequate for the safety of the public and that re-establishment of the Broad Street crossing on a *temporary* basis would relieve the immediate crisis and give time for an engineering study looking toward a permanent solution of the problem.

The evidence shows that 32,529 passenger cars used the Chestnut Street crossing on five days of the week of March 3, 1964, as compared to 13,085 passenger cars and trucks using the Broad Street crossing for a seven day period in September of 1925. There was a 25% increase in vehicles using the Chestnut Street underpass on April 7 and 9 of 1966, as compared to March 5 and 7 of 1964. The borough offered many witnesses, including the mayor, borough officers, president of the Borough Planning Commission, together with resolutions of twelve civic, religious and fraternal organizations, all of whom supported the reopening of the Broad Street grade crossing. The president of the Borough Planning Commission testified that present traffic congestion problems could not be alleviated by using the five crossings in the borough and that re-establishment of the Broad Street crossing was the only practical solution. In opposition appellant produced the testimony of Mr. Williams, a traffic engineer, who stated that modification of traffic controls at the Chestnut Street underpass and widening of the roadway would improve traffic conditions at that crossing. The witness described these measures as palliatives, a characterization concurred in by the commission. In the opinion of Mr. Williams the proposed Broad Street crossing would involve sharp turns, steep grades, complex signals at the adjoining intersections, and would be unsafe. Both Mr. Williams and an expert from the Department of Highways testified that the Chestnut Street underpass was adequate for traffic and would be for years to come.

In ordering construction of the Broad Street crossing as a temporary measure the commission directed appellant to install automatic flashing light warning signals and short arm gates. The borough recommended co-ordinating the street traffic lights with the crossing gates so that traffic could use Chestnut Street when the Broad Street gates were closed.

Testimony was offered showing a decrease in rail traffic combined with an increase in vehicular traffic since the 1926 order. Present rail traffic includes 14 passenger trains and 6 freight trains, or a total of 20 trains a day. This compares with 50 trains a day in 1925, with 3,100 pedestrians and 2000 vehicles traversing the crossing daily. The commission estimates that 5,000 vehicles would use the proposed Broad Street crossing each day.

Appellant contends the order of a temporary grade crossing at Broad Street constituted error as a matter of law because the crossing will be dangerous and unsafe. Admittedly the former crossing at Broad Street, with manually operated gates, was closed as unsafe. And here the commission found the possibility of accident prevented acceptance of the Broad Street grade crossing as a *permanent* solution. For this reason the commission limited Broad Street as a temporary crossing (not to exceed two years) and ordered a comprehensive engineering study to aid in finding a permanent solution. The evidence as to the adequacy of the Chestnut Street crossing was conflicting. The commission's order reopening the Broad Street crossing was supported by evidence, and within the discretion granted the commission in highway-rail crossing cases. Traffic congestion is an element to be considered in determining the public interest in cases involving highway-rail crossings: *Bridgewater Borough v. Pa. P.U.C.*, 181 Pa. Superior Ct. 84, 99, 124 A. 2d 165 (1956).

There is no merit in the contention of appellant that the commission exceeded its power in ordering *establishment* of a crossing at grade, rather than approving *construction* of such crossing. The borough in its application at A.92329 sought re-establishment of the crossing at grade, and the commission ordered such re-establishment, making full provision in its order for submission and approval of complete construction plans. Under §409(a) and (b) of the Public Utility Law, 66 PS §1179, the commission has full and exclusive power to determine the places and manner in which such crossing may be constructed. Under §409 the commission has power to prescribe the details of such construction (*Dept. of Highways v. Pa. P.U.C.,* 198 Pa. Superior Ct. 87, 98, 182 A. 2d 267 (1962)), and to order such construction upon application of the borough, or upon the commission's own initiative.

Paragraph 11 of the order directs the appellant to "abolish or close temporarily the pedestrian underpass." The main thrust of the order is to afford pedestrians adequate protection at the grade crossing. The part of the order directing closing of the underpass is not uncertain or indefinite. The commission allocated the cost of automatic protection at the crossing against appellant, estimated to be $54,000. Appellant does not object to this cost allocation, as such, but contends there should be no grade crossing at Broad Street. Under the commission's order, appellant is reimbursed 75% of the automatic protection cost by the Department of Highways and Montgomery County. We affirm the order for a temporary grade crossing at Broad Street.

Appellant also objects to that part of the order of October 24, 1966 which directs an engineering study of (a) traffic crossings in the borough, with a view to solving that problem by additional crossings, if necessary, and (b) a study of the feasibility of eliminating

13 crossings within and adjoining the borough by relocating appellant's tracks, on a six mile right of way, so as to by-pass the borough. Appellant says the proposed study is a highway planning study, ordinarily undertaken by a state or local planning commission, and is not within the power of the commission; that the commission's power to order relocation of the railroad tracks is limited to a particular crossing, and cannot encompass six miles of track and thirteen crossings. Appellant cited *Somerset County v. Pa. P.U.C.*, 132 Pa. Superior Ct. 585, 1 A. 2d 806 (1938), to the effect that the commission may not affect portions of a public highway not related to the grade crossing involved. Appellant alleges it is deprived of due process in that it had no notice and opportunity to be heard on such issues as were involved in the engineering study directed by the commission. The commission ordered appellant to reimburse the borough for 10%, not to exceed $3,500, of the cost of the engineering study.

We think the commission had full power to order the highway crossing study it did in this case and allocate the costs thereof. The commission has broad powers under §409, 66 PS §1179, and, though it deals with construction of highway "crossing," this necessarily includes jurisdiction over more than one crossing. Here the crossings were adjacent and contiguous on a six mile stretch of appellant's right of way. Certainly the commission may consider these crossings as interrelated for the purpose of determining what crossings are necessary in a given area, within and adjacent to the Borough of Souderton. The commission properly found in this case that the Chestnut Street underpass was inadequate and that "related" crossings, both within and outside the borough, "are within the corridor of highway traffic necessarily considered in this investigation." Under §401 of the Public Utility Law, 66 PS §1171, the commission may require appellant to furnish

and maintain safe and adequate facilities for the accommodation, convenience and safety of the public. Section 413, 66 PS §1183, gives the commission power to inquire into the safety and adequacy of a utility's facilities and order such changes as it finds necessary: *Reading Co. v. Pa. P.U.C.*, 188 Pa. Superior Ct. 146, 149, 150, 146 A. 2d 746 (1958); *Postal Telegraph-Cable Co. v. Pa. P.U.C.*, 154 Pa. Superior Ct. 340, 344-346, 35 A. 2d 535 (1944).

Appellant had notice throughout the various hearings that the adequacy of the Chestnut Street underpass to handle vehicular traffic in the Borough of Souderton was in issue. Such alleged inadequacy was the reason for opening the Broad Street crossing. Indeed, appellant's counsel repeatedly asked whether the borough had made any engineering studies in relation to the Chestnut and Broad Street crossings. Appellant can hardly be heard to object when relevant engineering studies are ordered by the commission. Under the facts of these proceedings appellant had notice and opportunity to be heard on the issues raised which encompassed the adequacy of the rail-highway crossings in and adjoining the Borough of Souderton. There was no violation of due process or lack of fair play. This part of the order involved only a preliminary study and contained no definite direction as to the measures to be taken with regard to the crossings involved. These are matters for future proceedings before the commission in which the parties concerned will have an opportunity to be heard.

On November 9, 1966 appellant filed a petition for rehearing of the October 24, 1966 order of the commission, under §1006 of the Public Utility Law, 66 PS §1396. By its order of January 30, 1967 the commission refused the petition for rehearing. This petition related principally to alleged errors of law in the commission's order of October 24, 1966, and it is evident

that the commission did not abuse its discretion in refusing the petition: *Phila. v. Pa. P.U.C.*, 185 Pa. Superior Ct. 598, 138 A. 2d 698 (1958); *Byers v. Pa. P.U.C.*, 176 Pa. Superior Ct. 620, 109 A. 2d 232 (1954). The Borough of Souderton filed a motion to quash the appeal on the ground the petition was not in reality a petition for "rehearing" and did not therefore act to extend the time for taking an appeal. While the petition dealt primarily with alleged errors of law, and not with newly discovered evidence or changed circumstances (Cf. *Phila. v. Pa. P.U.C.*, supra, 185 Pa. Superior Ct. 598), it was filed within the fifteen day limitation and was not so inherently deficient on its face or in substance, as not to extend the time for taking the appeal. The motion to quash will therefore be refused.

Order affirmed.